In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 20-2407

PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC.,

*Plaintiff-Appellee,*

*v.*

MARION COUNTY PROSECUTOR, *et al.,*

*Defendants-Appellants.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:18-cv-01219 — **Richard L. Young**, *Judge.*

———————

ARGUED JANUARY 12, 2021 — DECIDED AUGUST 2, 2021

———————

Before EASTERBROOK, WOOD, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* This appeal queries whether an Indiana statute that requires medical providers to report complications "arising from" abortions to the state is unconstitutionally vague on its face. Although the statute has some ambiguity, we conclude that Planned Parenthood has not shown that the law is unconstitutionally vague on its face in this pre-enforcement challenge.

## I. Background

Planned Parenthood of Indiana and Kentucky, Inc. ("Planned Parenthood") filed this suit on April 23, 2018 to challenge Indiana Senate Enrolled Act No. 340, which the governor signed into law on March 25, 2018. The Complaint took aim at two provisions of Enrolled Act No. 340—the Complications Statute and the Inspection Statute. The Complications Statute, Indiana Code § 16-34-2-4.7, required physicians to report to the state "any adverse physical or psychological condition arising from the induction or performance of an abortion." The Statute then provided a list of twenty-six conditions that the state considered reportable conditions. The word "including" preceded the conditions list, seemingly indicating that the list of twenty-six conditions was illustrative rather than exhaustive. The Inspection Statute, Indiana Code § 16-21-2-2.6, required annual inspection of abortion providers' facilities, even though other kinds of healthcare facilities are inspected less frequently. Planned Parenthood sued Indiana's Health Department Commissioner and several county prosecutors (collectively, "the Defendants") seeking a declaration that the two Statutes were unconstitutional and a permanent injunction enjoining the Statutes' enforcement.

In May 2018, Planned Parenthood moved for a preliminary injunction enjoining the enforcement of the Complications Statute. The district court held a hearing on the motion in June, and then granted Planned Parenthood's motion and preliminarily enjoined the enforcement of the Complications Statute as unconstitutionally vague.

In its order granting Planned Parenthood's motion, the court found that there was constitutionally intolerable overlap between "normal" side effects of abortions and

"complications" that would trigger the reporting requirement. As a result, the Statute "fail[ed] to inform [Plaintiffs of] what conduct is prohibited." The district court was concerned that physicians would "run the risk of being found … to be out of compliance with their statutory responsibilities" (and thereby risking time in prison and their medical licenses) for failing to report "every 'adverse physical or psychological condition' for which patients seek treatment as a reportable condition, no matter how routine, minor, and expected." The district court found the Complications Statute's illustrative list of conditions to be "so broad or vague that they do not remedy the uncertainty of the general definition of 'abortion complication.'"

In response, Indiana amended the Complications Statute. In the 2019 version, the legislature eliminated the "including" language that had previously indicated that the list was illustrative, as opposed to exhaustive. So, the 2019 version requires doctors to report only those conditions included on the Statute's list. As amended, the Complications Statute now requires physicians, hospitals, and abortion clinics to report abortion complications to the state that meet the following statutory definition:

(a) As used in this section, "abortion complication" means only the following physical or psychological conditions arising from the induction or performance of an abortion:

(1) Uterine perforation.

(2) Cervical laceration.

(3) Infection.

(4) Vaginal bleeding that qualifies as a Grade 2 or higher adverse event according to the Common Terminology Criteria for Adverse Events (CTCAE).

(5) Pulmonary embolism.

(6) Deep vein thrombosis.

(7) Failure to terminate the pregnancy.

(8) Incomplete abortion (retained tissue).

(9) Pelvic inflammatory disease.

(10) Missed ectopic pregnancy.

(11) Cardiac arrest.

(12) Respiratory arrest.

(13) Renal failure.

(14) Shock.

(15) Amniotic fluid embolism.

(16) Coma.

(17) Placenta previa in subsequent pregnancies.

(18) Pre-term delivery in subsequent pregnancies.

(19) Free fluid in the abdomen.

(20) Hemolytic reaction due to the administration of ABO-incompatible blood or blood products.

(21) Hypoglycemia occurring while the patient is being treated at the abortion facility.

(22) Allergic reaction to anesthesia or abortion inducing drugs.

(23) Psychological complications, including depression, suicidal ideation, anxiety, and sleeping disorders.

(24) Death.

(25) Any other adverse event as defined by criteria provided in the Food and Drug Administration Safety Information and Adverse Event Reporting Program.

Ind. Code § 16-34-2-4.7(a).

Licensed physicians, hospitals, and abortion clinics are subject to the Complications Statute and must submit to the state a complications report detailing the following information: the date the patient presented for treatment for the abortion complication; the patient's age, race, and county and state of residence; the type and date of the patient's abortion; the name of the facility where the patient had the abortion; details about any medications prescribed to the patient to facilitate the abortion; lists of any complications and the treatment provided; lists of any complications diagnosed or treated at follow-up visits; the dates of all follow-up visits; a statement regarding whether the complication was previously managed by the abortion provider or the abortion provider's required back-up physician; and a statement regarding whether the patient's visit to treat the complications was the original visit or a follow-up visit. *Id.* §§ 16-34-2-4.7(b, e).

The Statute imposes criminal penalties for failing to comply. "Each failure to report an abortion complication as required under this section is a Class B misdemeanor." *Id.* § 16-34-2-4.7(j). In Indiana, Class B misdemeanors are punishable by up to six months in prison and $1,000 in fines. *Id.* § 35-50-3-3. The Indiana Medical Licensing Board may also discipline physicians for failing to comply. *See id.* § 25-1-9-4(a)(3).

After the 2019 amendment, Planned Parenthood rejected Indiana's contention that the amendment rendered the Complications Statute constitutional. The parties therefore proceeded to brief cross motions for summary judgment.

The district court held that the Complications Statute is unconstitutionally vague and granted Planned Parenthood's motion as to the Complications Statute. The district court, however, upheld the constitutionality of the Inspection Statute. The court entered final judgment accordingly. On Planned Parenthood's motion, the district court amended its final judgment to reflect the inclusion of a permanent injunction against the enforcement of the Complications Statute, as amended.

Defendants now appeal the district court's grant of summary judgment to Planned Parenthood with respect to the Complications Statute. Planned Parenthood has not appealed the district court's decision with respect to the Inspection Statute. For the reasons discussed below, we reverse the district court's entry of summary judgment and remand for further proceedings.

## II. Discussion

We review the district court's grant of summary judgment de novo. *Cobb v. Aramark Corr. Servs., LLC*, 937 F.3d 1037, 1039 (7th Cir. 2019). "When reviewing cross-motions for summary judgment, 'all reasonable inferences are drawn in favor of the party against whom the motion at issue was made.'" *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (quoting *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The movant is entitled to summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." *Id.* (quoting *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018)).

The Supreme Court has long held that overly vague laws are unconstitutional under the Due Process Clause of the Fifth and Fourteenth Amendments. *See, e.g.*, *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926). Succinctly, "[i]n our constitutional order, a vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). The void-for-vagueness doctrine rests on the "twin constitutional pillars of due process and separation of powers." *Id.* at 2325; *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

> Only the people's elected representatives in the legislature are authorized to make an act a crime. Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide.

*Davis*, 139 S. Ct. at 2325 (internal quotations and citations omitted); *see also Dimaya*, 138 S. Ct. at 1212 (the vagueness doctrine is a "corollary of the separation of powers [doctrine]").

In *Connally*, the Court considered the constitutionality of an Oklahoma statute requiring the state to pay its employees "not less than the current rate of per diem wages in the locality where the work is performed." *Connally*, 269 U.S. at 388. The Court explained that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally*, 269 U.S. at 391. "[T]he terms of a penal statute creating a new offense must be sufficiently

explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law." *Id.* "The citizen cannot be held to answer charges based upon penal statutes whose mandates are so uncertain that they will reasonably admit of different constructions. … The crime, … must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue." *Id.* at 393. The Court concluded that the Oklahoma minimum wage law was too indefinite in two respects: the phrase "current rate of wages" and the term "locality" created a "double uncertainty" that was "fatal to [the law's] validity as a criminal statute." *Id.*

In 1972, the Court reiterated that the Constitution requires that legislatures draft criminal statutes with sufficient precision to inform persons of "common intelligence" of a law's requirements and to avoid arbitrary enforcement of the statute. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). There, the Court invalidated Florida's public vagrancy law as unconstitutionally vague, because it "failed[ed] to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute" and because it "encourage[d] arbitrary and erratic" enforcement. *Id.* (citing *United States v. Harriss*, 347 U.S. 612, 617 (1954); *Thornhill v. Alabama*, 310 U.S. 88 (1940); *Herndon v. Lowry*, 301 U.S. 242 (1937)).

More recently, the Court has abided by the *Papachristou* formula in a trilogy of as-applied challenges to federal criminal laws that imposed criminal liability based on the phrases "crime of violence" and "violent felony." *See Davis*, 139 S. Ct. at 2324; *Dimaya*, 138 S. Ct. at 1212; *Johnson v. United States*, 576

U.S. 591, 595 (2015). In *Johnson*, the Court invalidated the re-sidual clause of the Armed Career Criminal Act ("ACCA"), which defined "violent felonies" to include crimes involving "conduct" presenting "a serious potential risk of physical in-jury to another," because it failed both prongs set out by *Pa-pachristou*. *See Johnson*, 576 U.S. at 594–95; 18 U.S.C. § 924(e)(2)(B)(ii). The "Government violates [the Fifth Amendment's Due Process Clause] by taking away some-one's life, liberty, or property under a criminal law so vague that it fails to [1] give ordinary people fair notice of the con-duct it punishes, or [2] so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S. at 595 (citing *Kolender v. Law-son*, 461 U.S. 352, 357–58 (1983)). Moreover, the Court rejected any defense of ACCA's residual clause based on the existence of some crimes that would clearly fall within its scope:

> [O]ur holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp. For instance, we have deemed a law prohibiting grocers from charging an "unjust or unreasonable rate" void for vagueness—even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable.

*Johnson*, 576 U.S. at 602 (citing *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921); *Coates v. Cincinnati*, 402 U.S. 611 (1971)).

Three years later, the Court explained in *Dimaya* that the void-for-vagueness doctrine "guarantees that ordinary peo-ple have 'fair notice' of the conduct a statute proscribes [and] guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the

actions of police officers, prosecutors, juries, and judges." *Di-maya*, 138 S. Ct. at 1212 (citing *Papachristou*, 405 U.S. at 162; *Lawson*, 461 U.S. at 357–58). Accordingly, the Court found the statutory definition of a "crime of violence" under 18 U.S.C. § 16 was unconstitutionally vague, because it had the "same two features [as in *Johnson*] that conspired to make ACCA's residual clause unconstitutionally vague." *Id.* at 1216.

Finally, in 2019, the Court struck down 18 U.S.C. § 924(c)(3)(B)'s residual clause as vague in *United States v. Davis*. 139 S. Ct. at 2324. Like the "crime of violence" definitions at issue in *Johnson* and *Dimaya*, the residual clause of Section 924(c) penalized the use of a firearm during the commission of a crime of violence, defined as involving "a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Davis*, 139 S. Ct. at 2323–24. As mentioned above, the Court emphasized that the vagueness doctrine "rests on the twin constitutional pillars of due process and separation of powers." *Id.* at 2325.

We recently echoed these principles in *United States v. Cook*, 970 F.3d 866, 872–73 (7th Cir. 2020).

> The void-for-vagueness doctrine requires that a criminal statute define an offense with sufficient clarity that an ordinary person has fair notice of what conduct is prohibited and so as to avoid arbitrary and discriminatory enforcement. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."

*Id.* (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008); citing *Skilling v. United States*, 561 U.S. 358, 402–03 (2010); *United States v. Sylla*, 790 F.3d 772, 774–75 (7th Cir. 2015)).

## A. Notice

Here, several aspects of the Complications Statute give us some pause, particularly given the criminal penalties (including jail time) imposed for each violation of the Statute. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) (noting the Supreme Court's "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."); *Whatley v. Zatecky*, 833 F.3d 762, 777 (7th Cir. 2016) (same); *Copeland v. Vance*, 893 F.3d 101, 114 (2d Cir. 2018) ("The degree of vagueness that the Constitution tolerates … depends in part on the nature of the enactment.") (internal quotations omitted).

First, although we are aware of no other case holding the phrase "arising from" to be unconstitutionally vague, we acknowledge the district court's concern that the Statute is "not clear as to the extent to which a complication must be caused by the abortion itself." The Statute requires doctors to report the incidence of any one of the twenty-five listed conditions "arising from" an abortion, but the Statute does not give objective guidance regarding the temporal, spatial, or causal relationship between the abortion and the complication. *Cf. Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) (discussing the objective, anatomical landmarks specified by a federal abortion regulation that saved that regulation from being struck down as void).

Moreover, although several other states do impose abortion-complication reporting requirements on doctors, Indiana's broad formulation of its Complications Statute is unusual among peer statutes. First, not all reporting statutes impose criminal penalties on violators. *See, e.g.*, 18 Pa. Stat. and Cons. Stat. Ann. § 3214(i)(1) (imposing civil liability on doctors who fail to file the required report).[1] Furthermore, most of the other abortion-complication reporting statutes cited by Defendants use more specific language to guide doctors about the causal relationship required between the abortion and any complications. For example, Michigan's complications-reporting law provides that the complication must be the *primary, secondary, or tertiary result of* an abortion. *See e.g.*, Mich. Comp. Laws Ann. § 3.2837.[2] And besides using a more specific causation standard, the vast majority of complication-reporting statutes explicitly include some kind of "reasonable medical judgment" standard. *See, e.g.*, Ariz. Rev. Stat. Ann.

---

[1] *See also* Minn. Stat. Ann. § 145.4132 (delegating to the health commissioner the imposition of any penalties for violating the reporting requirement). And, as mentioned above, "the Court has … expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Vill. of Hoffman Estates*, 455 U.S. at 498–99.

[2] *See also* Nev. Rev. Stat. Ann. § 442.265 (requiring hospitals to report "[t]he number of patients admitted for hospital care for a complication which *resulted from* an abortion") (emphasis added); 18 Pa. Stat. and Cons. Stat. Ann. § 3214 ("Every physician who is called upon to provide medical care or treatment to a woman who is in need of medical care because of a complication or complications *resulting*, in the good faith judgment of the physician, from having undergone an abortion or attempted abortion shall prepare a report thereof and file the report with the department…") (emphasis added).

§ 36-2162 ("A health professional who provides medical care or treatment to a woman who, *in the good faith judgment of the health professional*, is in need of medical care because of a complication or complications resulting from having undergone an abortion…") (emphasis added).[3] We also have previously held that a reasonable medical judgment standard does not render a statute void for vagueness in the abortion-regulation context. *See Karlin v. Foust*, 188 F.3d 446, 459–60 (7th Cir. 1999).

Second, as the district court recognized, the statute lacks a mens rea or scienter requirement, despite carrying a potential term of imprisonment. The lack of a mens rea requirement is not dispositive, but "the Supreme Court has repeatedly held that imposing an intent requirement on an otherwise vague

---

[3] *See also* Mich. Comp. Laws Ann. § 333.2835 ("As used in this section and section 2837 "physical complication" means a physical condition occurring during or after an abortion that, under *generally accepted standards of medical practice*, requires medical attention.") (emphasis added); Minn. Stat. Ann. § 145.4132 ("A physician licensed and practicing in the state who knowingly encounters an illness or injury that, in the *physician's medical judgment*, is related to an induced abortion or the facility where the illness or injury is encountered shall complete and submit an abortion complication reporting form to the commissioner") (emphasis added); Miss. Code Ann. § 41-41-77 ("A physician shall file a written report with the State Department of Health regarding each patient who comes under the physician's professional care and requires medical treatment or suffers death that the *attending physician has a reasonable basis* to believe is a primary, secondary, or tertiary result of an induced abortion.") (emphasis added); Okla. Stat. Ann. tit. 63, § 1-738l(C) ("Any physician practicing in Oklahoma who encounters an illness or injury that a *reasonably knowledgeable physician* would judge is related to an induced abortion shall complete and submit, electronically or by regular mail, a Complications of Induced Abortion Report to the Department as soon as is practicable after the encounter with the induced-abortion-related illness or injury.") (emphasis added).

statute could save a law from a finding of impermissible vagueness." *Whatley*, 833 F.3d at 780 (on habeas review, law prohibiting drug possession within 1,000 feet of a "youth program center" was unconstitutionally vague) (collecting cases). *See also Gonzales*, 550 U.S. at 149 ("The Court has made clear that scienter requirements alleviate vagueness concerns."); *City of Chi. v. Morales*, 527 U.S. 41, 55 (1999) ("[I]t is clear that the vagueness of this enactment makes a facial challenge appropriate. … [The law at issue] is a criminal law that contains no *mens rea* requirement[.]"); *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (the Supreme Court "has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*."); *Duhe v. City of Little Rock*, 902 F.3d 858, 864 (8th Cir. 2018) (disorderly conduct statute not void for vagueness because it contained a mens rea requirement); *United States v. Nieves-Castano*, 480 F.3d 597, 603 (1st Cir. 2007) ("[The] scienter requirement ameliorates any vagueness concerns.").

> The [Supreme] Court, indeed, has recognized that the requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid. The constitutional vice in such a statute [without a mens rea requirement] is the essential injustice to the accused of placing him on trial for an offense, the nature of which the statute does not define and hence of which it gives no warning.

*Screws v. United States*, 325 U.S. 91, 101–02 (1945). Even among similar reporting statutes, Indiana's statute is atypical in its

exclusion of a mens rea requirement. *See, e.g.*, Ariz. Rev. Stat. Ann. § 36-2163 (criminalizing willful failure to comply).[4]

Third, the Statute criminalizes malum prohibitum ("wrong only because [it is] prohibited") as opposed to malum in se ("inherently wrong") conduct. *See Papachristou*, 405 U.S. at 163; *Arias v. Lynch*, 834 F.3d 823, 827 (7th Cir. 2016) (defining malum prohibitum and malum in se). Though these characteristics do not categorically make the Complications Statute unconstitutionally vague, they do heighten the notice concerns here given that an unwitting citizen may not be able to anticipate the malum prohibitum law in order to abide by it. *See United States v. Wilson*, 159 F.3d 280, 294 (7th Cir. 1998) (Posner, J., dissenting) ("The law is *malum prohibitum*, not *malum in se*; that is, it is not the kind of law that a lay person would intuit existed because the conduct it forbade was contrary to the moral code of his society."); *see also Conley v. United States*, 79 A.3d 270, 282 (D.C. 2013) ("[T]he requirement of notice embodied in due process 'places some limits' on the application of these tenets [that ignorance of the law is no defense] when a law criminalizes 'conduct that is wholly passive' … [and] unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed") (citing *Lambert v. People of the State of Cal.*, 355 U.S. 225 (1957)); *United States v. Jahagirdar*, 466 F.3d

---

[4] *See also* Mich. Comp. Laws Ann. § 333.2894 (criminalizing willful or knowing failure to comply); Miss. Code. Ann. § 41-41-79 (criminalizing willful failure to comply); Mo. Ann. Stat. § 188.065 (criminalizing knowing failure to comply; imposing civil penalties for willful failure to comply); Okla. Stat. Ann. tit. 63, § 1-738n (criminalizing knowing or reckless failure to comply); 18 Pa. Stat. and Cons. Stat. Ann. § 3214(i)(2) (criminalizing "willfully providing a report that the doctor knows to be false").

149, 154 (1st Cir. 2006) (distinguishing a statute criminalizing unconsented-to sexual acts from "ill-defined malum prohibitum violation[s]").

In sum, Indiana's Complications Statute provides few guideposts to inform practitioners of the conduct that is expected from them, especially when compared with similar statutes in other states. *See Cook*, 970 F.3d at 873 (acknowledging concern for whether a statute poses a "trap" for "the person acting in good faith"). The vagueness problem here is not that the Statute is missing one element or another. Rather, the factors outlined above create some uncertainty in the aggregate. Most critically, it is unclear what causal relationship is required between the abortion and the complication, and doctors are not provided with an objective standard by which to make that decision. *Cf. Gonzales*, 550 U.S. at 150 (noting the statute's provision of "objective standards"); *Whatley*, 833 F.3d at 778 ("Supreme Court precedent … requires criminal statutes to be based on discernable standards.").

## B. Limitations of a Facial Challenge

Despite the uncertainties that exist in the Complications Statute, we are mindful of the context of this litigation. This is a facial, pre-enforcement challenge to a state statute that Defendants acknowledge a state agency will interpret and apply. But at this time, the state agency has yet to issue guidance on the application and enforcement of the law and no state court has attempted to interpret it. *See Vill. of Hoffman Estates*, 455 U.S. at 499, n.5; *Tr. of Ind. Univ. v. Curry*, 918 F.3d 537, 541 (7th Cir. 2019).

Outside of the First Amendment context, such facial challenges are disfavored.

The general practice, outside of the First Amendment context, has been to consider the purported vagueness of a statute in light of the facts of the particular case— i.e., as applied—rather than in the abstract. This means, of course, that a litigant challenging the statute ordinarily must show that it is vague as applied to him; and if the statute undoubtedly applies to his conduct, he will not be heard to argue that the statute is vague as to one or more hypothetical scenarios.

Nonetheless, the Supreme Court has on a number of occasions entertained facial challenges to criminal statutes that do not implicate First Amendment concerns. … [T]he common thread uniting these cases with facial challenges in the First Amendment context appears to be a concern (or at least a colorable contention) that the challenged statute simply has no core and lacks any ascertainable standard for inclusion and exclusion. Such a standardless statute poses a trap for the person acting in good faith, who is given no guidepost by which he can divine what sort of conduct is prohibited. The concern is heightened when the statute contains no *mens rea* requirement, and the uncertainty as to exactly what is proscribed threatens to inhibit the exercise of constitutionally protected rights.

*Cook*, 970 F.3d at 873 (internal citations and quotations omitted). *See also Vill. of Hoffman Estates*, 455 U.S. at 495, n.7; *Sec. of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 965–66 (1984) ("Here there is no core of easily identifiable and constitutionally proscribable conduct that the statute prohibits."); *Tr. of Ind. Univ.*, 918 F.3d at 541 ("[A] core of meaning is

enough to reject a vagueness challenge, leaving to future adjudication the inevitable questions at the statutory margin.").

Facial challenges that do not involve the First Amendment are "limited." *Fuller ex rel. Fuller v. Decatur Pub. Sch. Br. of Educ. Sch. Dist. 61*, 251 F.3d 662, 666 (7th Cir. 2001). "The Supreme Court has repeatedly stated that facial invalidation of legislation is disfavored." *United States v. Bonin*, 932 F.3d 523, 534 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 960 (2020). So, "courts have looked with disfavor on facial vagueness challenges to statutes that do not implicate fundamental rights." *Farrell v. Burke*, 449 F.3d 470, 495 (2d Cir. 2006) (Sotomayor, J.); *see also id.* at 496 (noting the "general rule" that facial vagueness challenges outside of the First Amendment context are disfavored); *United States v. Requena*, 980 F.3d 30, 40 (2d Cir. 2020). Indeed, principles of federalism require us to tread especially carefully when reviewing a state law where the state courts have not had an opportunity to "give the law a construction that will produce adequate clarity." *Tr. of Ind. Univ.*, 918 F.3d at 542. As we said there, "we are not aware of any other decision by the Supreme Court that has used vagueness doctrine to prevent the state judiciary from having even a chance to give the law a construction that will produce adequate clarity." *Id.*

Here, we cannot conclude that the Complications Statute has no discernable core. *See Cook*, 970 F.3d at 873. Although Planned Parenthood contests the frequency and seriousness of abortion-related complications, Planned Parenthood's response brief acknowledges that "[t]here are potential complications from the performance of medication and surgical abortion." Planned Parenthood maintains that several of the complications listed in the Complications Statute are "not

abortion-specific complications and almost never occur as a result of abortions," but the brief stops short of stating that these complications are impossible.

The complications that a reasonable doctor would find to have arisen from an abortion constitute a core of the Complications Statute. *See Cook*, 970 F.3d at 873; *see also Tr. of Ind. Univ.*, 918 F.3d at 541 ("[A] core of meaning is enough to reject a vagueness challenge").[5] Although these complications may be rare, an individual of ordinary intelligence would understand that there may be complications that arise from an abortion (as is the case with any medical procedure). And when one such rare complication occurs, the physician must report it if she believes in her reasoned medical judgment that the complication arose from an abortion. This "core" of the Complications Statute satisfies the void-for-vagueness test: It is understandable by persons of ordinary intelligence and not subject to arbitrary enforcement.[6]

As a result, although we appreciate the dissent's concerns about the ambiguity of this Statute, the Statute must survive Planned Parenthood's pre-enforcement, facial attack. Our precedents, especially *Trustees of Indiana University*, preclude any other result in this case. *See* 918 F.3d at 541. While the dissent focuses on the ambiguity in the Statute, it ignores the procedural posture of this case as a pre-enforcement, facial challenge and the case law governing such facial challenges

---

[5] And again, we have already held that a reasonable medical judgment standard itself does not render a law void for vagueness. *See Karlin*, 188 F.3d at 459–60.

[6] At least, we have no evidence of arbitrary enforcement of the Statute before us at this stage.

outside of the First Amendment arena. *See, e.g., id.* Though an as-applied vagueness challenge to the Statute may have a different outcome, *this* challenge to the Statute fails because it is a facial challenge to a statute with a discernable core.

In finding that the Complications Statute has a core composed of those complications that the treating physician reasonably believes to have arisen from an abortion, we are not imposing our own construction of the statute upon Indiana, which we cannot do. "As federal judges 'we are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent.'" *Wisc. Right to Life, Inc. v. Barland*, 751 F.3d 804, 833 (7th Cir. 2014) (quoting *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000)).

We are cognizant of the Supreme Court's admonition that its "*holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson*, 576 U.S. at 602 (emphasis in original); *see also City of Houston, Tex. v. Hill*, 482 U.S. 451, 458 (1987). We do not hold that the Complications Statute is constitutional merely because there may be some complications that clearly arise from an abortion. Instead, we only hold that these clear-cut cases constitute a core of the Complications Statute that renders the Statute immune from this pre-enforcement facial challenge. Notably, *Johnson*'s proposition that a statute is not necessarily constitutional because there are some obvious cases that fall within the statute's purview relied on *L. Cohen Grocery* and *Coates*, both of which were as-applied challenges by parties against whom the statute in question had already been enforced. *See id.* (citing *L. Cohen Grocery*, 255 U.S. at 89 (defendant charged with willfully setting an unreasonably high price for sugar); *Coates*,

402 U.S. at 611 (defendants charged with and convicted of violating ordinance prohibiting three or more persons assembling on a sidewalk and "conduct[ing] themselves in a manner annoying to persons passing by"). In contrast, Planned Parenthood has brought a pre-enforcement, facial challenge here. And to survive this facial challenge, Defendants must only demonstrate that the Statute has a discernable core. *See Cook*, 970 F.3d at 874. We hold that the Statute does have such a core. The enforcement of this Statute will inevitably present many uncertainties at the margins, but the resolution of those "edge questions" arising from the enforcement of a state law is a "principal role of the [state's] courts." *Tr. of Ind. Univ.*, 918 F.3d at 541.

In addition to finding that the Statute has a discernable core, we are also mindful of the second portion of the void-for-vagueness test, which analyzes the potential for arbitrary enforcement of the challenged statute. *Johnson*, 576 U.S. at 595. This law has yet to be enforced—it "is a preenforcement challenge, where 'no evidence has been, or could be, introduced to indicate whether the [Act] has been enforced in a discriminatory manner[.]'" *Gonzales*, 550 U.S. at 150 (citing *Vill. of Hoffman Estates*, 455 U.S. at 503). Here, unlike in *Johnson*, "there is no judicial history of courts struggling to appreciate what particular conduct" Indiana's legislature intended to reach or of courts struggling "to apply the statutory terms to varying sets of facts." *Cook*, 970 F.3d at 877.

"We do not suggest that the risk of discriminatory enforcement is insignificant here." *Vill. of Hoffman Estates*, 455 U.S. at 503. It is certainly possible that Indiana may enforce this law in an arbitrary manner that offends due process, particularly in a highly controversial area like the regulation of abortion.

Again, a future, as-applied challenge may be successful. But, "we are not prepared to hold that this risk jeopardizes the entire" statute in a pre-enforcement, facial challenge. *Id.*; *see also Tr. of Ind. Univ.*, 918 F.3d at 541. We will not "assume that [Indiana] will take no further steps to minimize the dangers of arbitrary enforcement." *Vill. of Hoffman Estates*, 455 U.S. at 504. Indeed, the Indiana defendants have already represented to this Court that the Statute will be interpreted in several ways to limit its scope and decrease any ambiguity in its application. Indiana's opening brief tells us for instance, that to qualify as a reportable complication, an abortion must be the but-for cause of the complication. Moreover, the Defendants argue that the "arising from" standard is "necessarily based on the physician's medical judgment," which "takes into account the background and training of the reporter for purposes of understanding what must be reported." Though these representations are not binding,[7] we think it prudent to refrain from "blot[ting] the law from the books" before Indiana has an opportunity to issue administrative guidance and enforce the law in a manner consistent with the Constitution. *Tr. of Ind. Univ.*, 918 F.3d at 541. Still, the Indiana State Department of Health would be well-advised to formally interpret the law to include a reasonable medical judgment standard, consistent with its representations to this Court. In addition, the Department might consider other limitations in its enforcement of the law, such as limiting the reporting requirement to complications that arise within one year of a patient undergoing an abortion, which would help to avoid penalizing

---

[7] *Tr. of Ind. Univ.*, 918 F.3d at 540 ("Prosecutors can't offer definitive interpretations of criminal laws[.]").

doctors attempting to comply with the law in good faith. *Cf. Cook*, 970 F.3d at 873.

Finally, we pause briefly to note that this case as currently briefed does not directly implicate or "inhibit the exercise of constitutionally protected rights[,]" which would heighten our concern about the vagueness of the statute. *Id.* (quoting *Colautti*, 439 U.S. at 391) (vagueness concerns are "heightened when the statute contains no *mens rea* requirement and the uncertainty as to exactly what is proscribed threatens to inhibit the exercise of constitutionally protected rights.") (internal quotations omitted); *see also Hill*, 482 U.S. at 458–59. Our analysis is strictly limited to the facts as currently pled in Planned Parenthood's complaint, which do not suggest that the Statute interferes with or chills a protected constitutional right.

## C. Planned Parenthood's Remaining Arguments

Planned Parenthood argues in the alternative that even if the entire Statute is not unconstitutionally vague, two of the enumerated complications, Items 23 and 25,[8] are overly vague. Though we agree that these particular complications (such as, general "anxiety") are especially imprecise, any ambiguity in these two provisions does not change our overall

---

[8] As provided for by Ind. Code § 16-34-2-4.7(a):

Item 23: Psychological complications, including depression, suicidal ideation, anxiety, and sleeping disorders. ….

Item 25: Any other adverse event as defined by criteria in the Food and Drug Administration Safety Information and Adverse Event Reporting Program.

conclusion that the Statute must survive this pre-enforcement, facial challenge for the reasons outlined above.

Planned Parenthood also argued in the district court that the Complications Statute is both irrational and violates due process. The district court, however, did not take up those arguments after finding that the Statute was unconstitutionally vague. We take no position on these arguments and remand for the district court to consider these arguments in the first instance, to the extent the parties still seek a judicial decision on them. *See Anderson v. City of Rockford*, 932 F.3d 494, 512 (7th Cir. 2019); *FMS, Inc. v. Volvo Const. Equip. N. Am., Inc.*, 557 F.3d 758, 763 (7th Cir. 2009) ("When the parties brief an issue that has not been addressed by the district court, it is not unusual for this court to remand so that the district court may consider the issue in the first instance.").

### III. Conclusion

Because we conclude that the Complications Statute does have a discernable core for the purposes of this pre-enforcement, facial challenge, we REVERSE the district court's entry of summary judgment in favor of Planned Parenthood on its vagueness challenge and VACATE the district court's permanent injunction on that basis. The case is REMANDED to the district court for further proceedings not inconsistent with this opinion.

WOOD, *Circuit Judge*, dissenting. It has become an article of faith that federal judges, when construing statutes, must adhere scrupulously to the words chosen by the enacting legislature. If the legislature has written a foolish law, so be it—the process for changing that law is to return to the legislature for corrective action, while in the meantime the foolish law stands. But if the legislature has written an incomprehensible law, the remedy is not for the judiciary to take a red pencil to it and, under the guise of statutory construction, create something that people of ordinary intelligence can follow. In the latter case, the court cannot let the incomprehensible law stand. The only choice is to strike it down as void for vagueness. *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019) ("When [the legislature] passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite [them] to try again.").

In the present case, we have before us the 2019 version of an Indiana law that imposes a reporting requirement on physicians, hospitals, and abortion clinics (collectively, Reporters), with respect to any "complication" "arising from the induction or performance of an abortion." Ind. Code § 16-34-2-4.7(a). If a Reporter fails to file a report, he or she has committed a Class B misdemeanor, *id.* § 16-34-2-4.7(j), and faces up to six months in prison and $1,000 in fines, *id.* § 35-50-3-3. Professional consequences are likely to ensue after such a criminal conviction, including loss of license. The district court, after a careful look at the law and the record, found that this statute is unconstitutionally vague and issued a permanent injunction against it.

My colleagues have voted to overturn that injunction, on the theory that they can find an essential "core" meaning to the law. But, without admitting this in so many words, their rationale amounts to a concession that no such permissible core meaning can be discerned without adding critical new terms to the law. It is hard to believe that this is an approach that courts would, or should, generalize. And indeed, I suspect that there is no appetite to do so. To my knowledge, there is no rule saying that courts should bend over backwards when faced with an abortion law, but not when the law in question relates to gun ownership or use, violence against women, or immigrants' rights. I therefore dissent.

The majority and I do share some common ground. We all recognize that the Supreme Court has held that "overly vague laws are unconstitutional under the due process clause[s] of the Fifth and Fourteenth Amendments." *Ante* at 7, citing *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926). Or as the Court put it more pithily two years ago, "a vague law is no law at all." *Davis*, 139 S. Ct. at 2323. Justice Scalia identified the key point in an opinion dealing with a statute that criminalizes the pandering or solicitation of child pornography. *United States v. Williams*, 553 U.S. 285 (2008). After finding that the statute in question, 18 U.S.C. § 2252A(3)(B), was not subject to facial invalidation on overbreadth grounds, the Court turned to vagueness doctrine. It then explained what "vagueness" means for purposes of due process:

> What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, we have struck down statutes that tied

> criminal culpability to whether the defendant's conduct was "annoying" or "indecent"—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.

553 U.S. at 306. People cannot be required to play a game of "Twenty Questions" to figure out what exactly they have done (or perhaps someone else has done) that might, or might not, violate a particular law. And courts are not permitted to rewrite statutes to provide that clarity, as I already have noted.

The majority concedes that the Indiana statute before us does not tell the Reporter "the extent to which a complication must be caused by the abortion itself." This is a serious flaw, and it permeates the statute, thus making this case appropriate for a facial challenge. Not a single condition on the state's list is unique to abortions, and so a medical-care provider will have no idea whether or not he or she has a reporting obligation. And I am not exaggerating when I say "not a single condition." First and foremost, the fact that a pregnancy has ended in no way suggests that it ended by abortion of any kind. It is well known that many pregnancies end in natural miscarriage—the Mayo Clinic, for instance, has this to say:

> Miscarriage is the spontaneous loss of a pregnancy before the 20th week. About 10 to 20 percent of known pregnancies end in miscarriage. But the actual number is likely higher because many miscarriages occur so early in pregnancy that a woman doesn't realize she's pregnant.

See Mayo Clinic, Miscarriage, https://www.mayoclinic.org/diseases-conditions/pregnancy-loss-

miscarriage/symptoms-causes/syc-20354298. That is an equally compelling, alternative explanation for at least conditions (2), (3), (4), (7), (8), (9), (10), and (15). Uterine perforation (item 1) can also be caused by a badly placed intra-uterine device (IUD). Infection (item 3) can be caused by countless sources. What if a woman goes to her doctor for a routine gynecological examination a year after she has had a medical abortion, and the doctor detects an infection? Must it be reported? Does the doctor face imprisonment and loss of license if she sees no link between the infection and the earlier procedure? The doctor makes this call at her personal peril.

Heavy vaginal bleeding (item 4) is equally ambiguous. This is a condition more formally called menorrhagia, which can be caused by anything from hormone imbalances, dysfunction of the ovaries, uterine fibroids, polyps, adenomyosis, IUDs, pregnancy complications such as impending miscarriage or placenta previa, cancer, inherited bleeding disorders, medications, to liver or kidney disease. See Mayo Clinic, Menorrhagia (heavy menstrual bleeding), at https://www.mayoclinic.org/diseases-conditions/menorrhagia/symptoms-causes/syc-20352829). Similarly, a pulmonary embolism (item 5), which is caused by a blocked artery in the lungs, can stem from countless sources. What doctor will jump to the conclusion that the cause was an abortion? Risk factors for pulmonary emboli include heart disease, several different cancers, surgery, prolonged immobility, COVID-19, smoking, obesity, in addition to pregnancy and birth-control pills. See Mayo Clinic, Pulmonary embolism, at https://www.mayoclinic.org/diseases-conditions/pulmonary-embolism/symptoms-causes/syc-20354647. Deep vein thrombosis (item 6) is essentially the same—that simply describes one of the places where a blood clot might originate. *Id.*

It is common knowledge that cardiac arrest (item 11), respiratory arrest (item 12), renal failure (item 13), shock (item 14), coma (item 16), and hemolytic reaction resulting from the administration of incompatible blood products (item 20) can stem from countless causes. No doctor seeing a woman who presented with one of these problems would have the slightest reason to suspect that an abortion was involved—and certainly not an abortion that occurred months or years earlier. These conditions are so general as to be entirely uninformative. The same is true of an allergic reaction to anesthesia (item 22). Allergic reactions to abortion-inducing drugs (item 22) may seem like a closer call, but even there, no abortion may have been undertaken. Typically, medical abortions are accomplished with a two-drug protocol: mifepristone to lower progesterone levels, and misoprostol to control bleeding. But once again, there are independent medical reasons why someone might need medication to lower her progesterone, and so knowledge that this drug was used is inconclusive. High levels of progesterone might indicate ovarian cysts, an adrenal disorder, or ovarian cancer. See Verywell Health, Symptoms of High Progesterone, at https://www.verywellhealth.com/high-progesterone-symptoms-5185751. Misoprostol, though used for abortions, is more commonly used to prevent stomach ulcers while taking non-steroidal anti-inflammatory drugs (NSAIDs). See WebMD, Misoprostol, at https://www.webmd.com/drugs/2/drug-6111/misoprostol-oral/details. So an allergic reaction to either of these drugs might or might not have anything to do with an abortion.

That leaves hypoglycemia—low blood sugar—while at the abortion facility (item 21), an utterly undefined set of psychological complications (item 23), death (item 24), and

"anything else defined by FDA criteria (item 25). These too provide little to no focus for the hapless medical-care provider. Low blood sugar is common, even in healthy people. Why is there a link to abortion, or even a medical procedure? The statute does not say. As for psychological consequences, no one has the slightest idea of which ones, or at what level of severity, the legislature had in mind, much less when they must arise, or what connection to the abortion they might have. Must everyone with sleep apnea, a serious sleeping disorder, be reported routinely, for instance? How about restless leg syndrome?

And finally, there is death. How soon must death occur after an abortion for it to be considered a complication of abortion? Statistics indicate that abortion-related mortality in the United States is extremely low. See Suzanne Zane *et al.*, Abortion-Related Mortality in the United States 1998–2010, at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4554338/ (reporting that during the period from 1998 to 2010, there were approximately 16.1 million abortion procedures, and 108 women died, for an exceedingly low mortality rate of 0.7 deaths per 100,000 procedures). But the State of Indiana has chosen to give no guidance on this factor, either.

The statute is also fatally silent on several other critical points: (1) is the causation standard for "arising under" liability but-for, contributing factor, or just a presumption that if B follows A, then A must have had something to do with B (the much maligned *post hoc ergo propter hoc* fallacy); (2) is there any period of time after which a Reporter is entitled conclusively to presume that all consequences of the earlier abortion have been resolved; and (3) does liability depend on the Reporter's subjective assessment of the link between the

abortion and a listed consequence, or does it depend on the assessment that an objective expert in the field would make?

In addition, the statute makes breathtakingly broad assumptions about the amount of information that will be available to Reporters, and in so doing, it has a sweeping extraterritorial effect. Nothing limits the reporting duty to information the Reporter obtained through the course of her or its own treatment of the patient; nothing assures that the patient either has told the Reporter about past details of her medical history or about precise diagnoses and follow-up treatment; and nothing limits the reporting duty to encounters within the state of Indiana. If a woman had an abortion in a state or country where abortions are legal, and then five years later she sees a gynecologist who finds polyps, must that doctor still report to Indiana pursuant to subpart (a)(4)? Who knows? The only thing that is clear is that the doctor must make that call while putting her reputation, license, and liberty on the line.

The Indiana law has numerous other deficiencies that the majority has recognized. It uses a system of criminal penalties rather than civil measures; it contains no *mens rea* or *scienter* requirement; and there is nothing inherently evil about the conditions it identifies (and thus it is imposing these harsh penalties on acts that are *mala prohibita*, not *mala in se*).

When we consider whether the plaintiff, Planned Parenthood, has proven that this law is vague *on its face*,[1] we

---

[1] I do not know why the majority thinks that I do not appreciate the facial nature of this challenge. My point is that there is *no* agreed core of meaning that can save this particular law, making it one of the small group of statutes that lack facial validity. Just as the Supreme Court held in *Samuel Johnson v. United States*, 576 U.S. 591 (2015), the due process clauses

must remember Justice Scalia's definition: are we worried about how definitively a particular fact has been proven, or is our hapless Reporter unable to figure out what fact to prove in the first instance. I do not understand my colleagues to be taking the position that if a Reporter wanted to play it safe, the Reporter could simply inundate the Indiana Health Department with reports about every single medical visit every woman in the state makes while she is between the ages of 12 and 50, just in case there was an undisclosed abortion or, if the abortion is known, there is even a remotely possible link between that abortion and an item on the state's list. But perhaps, given my colleagues' view of the statute, that is what Reporters should do, knowing that they will not risk omitting some information.

My colleagues take refuge in their conclusion that there is some discernable core to the Indiana statute before us, which they dub the Complications Statute. But they cannot do this without rewriting the statute. They first limit the statute to "[t]he complications that a *reasonable doctor* would find to have arisen from an abortion … ." *Ante* at 19. That sounds like an objective standard. But literally two sentences later (three if you count a citation), they seem to adopt a subjective standard, when they look to a complication "which the treating

---

forbid government from taking life, liberty, or property "under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Id.* at 595, citing *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983). Even if one thought that the Indiana law gives fair notice of the breathtakingly broad set of triggering events, there can be no doubt that it is so standardless that it fails under the arbitrary enforcement branch of vagueness doctrine. The majority avoids this outcome only by its extensive tinkering with the text of the law.

physician believes in *her* reasoned medical judgment to have arisen from an abortion." *Id.* (emphasis added). I grant that *Karlin v. Foust*, 188 F.3d 446 (7th Cir. 1999), held that a "reasonable medical judgment" standard does not render a law void for vagueness. *But the law in* Karlin *specified exactly that standard*: it covered "a condition, in a *physician's reasonable medical judgment*," that amounts to a medical emergency. If the Indiana law said anything like that, whether using the same words or their equivalent, we would have a different case. But it does not.

Immediately after this passage, which as I said leaves ambiguous whether the majority is adopting an objective or a subjective standard, the opinion pivots back to something that looks more objective: it asserts that "the Complications Statute has a core composed of those complications that the treating physician reasonably believes to have arisen from an abortion." *Ante* at 19. It says this despite acknowledging that a statute is not constitutional "merely because there may be some complications that clearly arise from an abortion." *Ante* at 20. *Johnson v. United States*, 576 U.S. 591 (2015), confirms this, when it says that "a statute is not necessarily constitutional because there are some obvious cases that fall within the statute's purview." *Ante* at 20. The problem is the guessing game: Reporters will never know what triggers their duty to report, so they will miss some of the wheat and over-report some of the chaff, all at the risk of criminal liability, and all without even a negligence standard protecting them, much less a higher level of *scienter*.

To summarize, Indiana's statute covers nothing but what my colleagues call "edge questions." Although I do not doubt that it would be possible to write a reporting statute of this

type that would avoid unconstitutional vagueness, Indiana has not done so yet. It is not clear to me whether the Indiana Department of Health can limit the law as drastically as my colleagues advise, *ante* at 22—a federal agency would be obligated to keep its administrative rules within the scope of the authorizing statute, but maybe Indiana does not follow that principle—but for now there is no reasonable medical judgment standard, no temporal limitation, no *scienter* requirement, and no but-for causal standard. The district judge correctly found that this left an empty core that cannot be enforced consistently with the due process clause of the Fourteenth Amendment. I would affirm its judgment, and so I respectfully dissent.